# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **BRIDGETT CATENA HOLT** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil No. 3:16-CV-01971 (VLB)** |
| | : | |
| **CAROLYN W. COLVIN,** | : | |
| **COMMISSIONER OF SOCIAL** | : | **Date: March 13, 2018** |
| **SECURITY,** | : | |
| **Defendant.** | : | |

## RULING ON THE PLAINTIFF'S MOTION TO REVERSE AND THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

Before this Court is an administrative appeal following the denial of the application for disability insurance ("DI") benefits and supplemental security income ("SSI") benefits filed by Plaintiff Bridgett Catena Holt ("Holt" or "Plaintiff"). Plaintiff requests the decision issued by the Commissioner of Social Security ("the Commissioner" or "Defendant") be reversed and remanded pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) on the basis that ALJ Ronald Thomas ("ALJ Thomas") failed to develop the administrative record, misconstrued the evidence, failed to assess Plaintiff's impairments as a whole, and did not properly present hypothetical scenarios to the vocational expert during the hearing. The Commissioner moves to affirm. For the following reasons, the Court GRANTS Plaintiff's motion and DENIES Defendant's motion.

## Background

The parties have stipulated to the facts set forth in Plaintiff's Statement of Facts. *See* [Dkt. 21-1 (Pl. Stmt of Facts); Dkt. 22-1 (Mot. Affirm) at 2]. The Court has

reviewed the evidence and adopts the stipulated facts, hereby incorporating them into this opinion. The following facts derive from the stipulated facts and the record.

Plaintiff was born in March of 1969 and alleges her disability began on or about May 1, 2005. *See* [R. 115]. Plaintiff applied for DI and SSI benefits on June 7, 2013, when she was 44 years old. [R. 114]. At the time of the administrative hearing on January 23, 2015, Plaintiff was living with her mother, stepfather, sister, and her sister's son. [R. 205].

I.   Plaintiff's Medical History

Prior to Plaintiff's onset date, Thomas Rago, M.D. ("Dr. Rago"), diagnosed Plaintiff with carpal tunnel syndrome in both hands on June 23, 2000. [R. 460]. She received carpal tunnel release surgery for her left hand on August 22, 2000, but did not have surgery on her right hand due to slow healing and her request to hold off on surgery. [R. 460-61].

On September 22, 2005, Plaintiff returned to Dr. Rago on September 22, 2005, with complaints of pain and swelling in and around her right thumb. [R. 464]. Dr. Rago observed the plaintiff still had "very mild carpal tunnel disease" and that symptoms were minimal so no treatment was recommended. [R. 464]. Her file was directed to remain open in case she needed surgery in the future. [R. 464]. Dr. Rago identified her complaints relating to trigger thumb, "some capsulitis," and "early arthritis at the base of her thumb." [R. 464].

On February 3, 2006, Plaintiff visited Orthopedic Specialty Group P.C. ("OSG") with complaints of severe pain in her neck and arm. [R. 628]. Plaintiff underwent x-ray testing of her cervical spine, wherein osteophytes (i.e. bone spurs) were discovered in her lower vertebrae. Dr. Malin[1] concluded Plaintiff's "presentation is that of a cervical disk disease with a combination of C-6 symptoms on the right and C-7 symptoms on the left." [R. 628]. At that time, Dr. Malin recommended physical therapy and over-the-counter anti-inflammatories. [R. 628]. On February 27, 2006, Plaintiff had a follow up appointment at OSG and was noted to have "markedly improved" as a result of physical therapy and the use of traction. [R. 627]. It was also noted that the Plaintiff had a "good range of motion of the shoulders elbows and wrist" with "mild pain" in her left trapezius paracervical region when she extended. [R. 627].

Plaintiff returned to OSG on January 18, 2008 and was seen by Henry A. Backe, Jr., M.D. ("Dr. Backe"). [R. 469]. She complained of wrist and hand pain, "numbness and tingling that radiates up her forearm," and "mild discomfort" in her elbow. [R. 469]. Dr. Backe's notes indicate Plaintiff's carpal tunnel symptoms returned when she resumed repetitive work, so she stopped working with her initial employer in 2001 and again with a second employer within a year "due to the progressive pain her hands and wrist." [R. 469]. At that time she had no complaints of neck pain and had full motion in her cervical spine, elbow, forearm,

---

[1] The record does not indicate Dr. Malin's first name.

and wrist. [R. 469]. She went to OSG for follow-up treatment regarding pain in her arms and hands on February 4, February 26, and March 26 of 2008. [R. 471-73].

Plaintiff returned to OSG approximately one year later on May 14, 2009, complaining of numbness in both hands, pain in her left elbow and forearm, and swelling in her forearm. [R. 470]. Dr. Backe conducted a physical examination and determined she had full range of motion in her cervical spine and shoulder. [R. 470]. Dr. Backe concluded Plaintiff would benefit from a right carpal tunnel release and a repeat left carpal tunnel release. [R. 470]. Dr. Backe stated that if Plaintiff did not respond to treatments and injection therapy, she may require surgical intervention. [R. 470]. He also stated, "I do not think this patient has a good chance of returning to a former type of work. This would only cause recurrence of her symptoms." [R. 470].

On December 7, 2011, Plaintiff visited the St. Vincent Medical Center's Emergency Department with complaints of chest pain and shortness of breath. [R. 723-32]. She was prescribed an albuterol inhaler and 600 mg Motrin, and then was discharged. [R. 728]. On February 29, 2012, Holt visited St. Vincent Medical Center's Family Health Center for neck, upper back, and shoulder pain. [R. 707]. At that time, Holt underwent a cervical spine and left shoulder x-ray as well as a thyroid sonography. [R. 483]. She received her results on April 18, 2012: her thyroid was negative for nodules, and she was noted to have large osteophytes in the C-4 through C-7 region of the spine and mild degenerative joint disease of the spine and left shoulder. [R. 485].

On May 21, 2012, Holt visited Advanced Radiology consultants for an MRI as follow-up to her visit to the Family Health Center. [R. 465, 467]. The MRI showed numerous osteophyte complexes and several disc herniations. [R. 465, 467]. Gerard J. Muro, M.D. ("Dr. Muro"), evaluated the results as "multilevel degenerative changes resulting in central canal stenosis at C4-5 through C7-T1 levels." [R. 467]. An MRI of the thoracic spine showed a herniated disc at the T1-2 resulting "moderate right lateral recess and mild right sided foraminal stenosis." [R. 466].

Plaintiff returned to OSG on June 13, 2012, for "daily left sided neck, posterior thigh and thoracic complaints." [R. 477-78]. Plaintiff informed John N. Awad, M.D. ("Dr. Awad"), that her "symptoms were constant" and ranged between "severe and extremely severe." [R. 477]. Dr. Awad discussed physical therapy with the Plaintiff and decided to hold off considering any possible injections until after seeing the outcome of physical therapy. [R. 478].

Plaintiff attended physical therapy at Ahlbin Centers for Rehabilitation Medicine Bridgeport hospital for 3 months from June 23, 2012, to September 29, 2012. [R. 641-45]. The therapy discharge notes stated "goals not met" and "patient has had max benefit from therapy." [R. 629]. At her follow up appointment on July 25, 2012, Dr. Awad diagnosed Plaintiff with "C4-C5, C5-C6 and C6-C7 central canal stenosis without myelopathy and mechanical leg pain." [R. 476]. Dr. Awad did not believe surgical intervention was necessary at that time, he would continue monitoring the patient and reassess if she presented myelopathy or significant radiculopathy. [R. 476]. At Plaintiff's next follow up October 24, 2012, her condition was unchanged. [R. 475].

On November 15, 2012, Plaintiff received a chest CT scan at St. Vincent's Health Services, which showed an enlarged thyroid. [R. 651-52]. She received a pulmonary function test the next day and her results were within the normal range for most of the tests; Robert B. Brown, M.D. ("Dr. Brown"), opined her reduced "ERV" could be attributed to her obesity. [R. 519]. Plaintiff made several medical visits in regards to her persistent shortness of breath. [R. 480-506]. On May 24, 2013, Plaintiff was seen at St. Vincent's Chest Clinic, where Plaintiff complained three to four times a week she needed to take deep breaths and these episodes lasted for ten minutes at a time before subsiding; albuterol sometimes gave mild relief. [R. 510].

On July 8, 2013, Plaintiff returned to St. Vincent's Family Health Center with complaints of tightness in both of her legs. [R. 551]. Shortly thereafter on July 19, 2013, Plaintiff went to St. Vincent's Emergency Room with complaints of "swelling and tightness in both legs" and swelling in her neck. [R. 529]. She also visited St. Vincent's Family Health Center on August 12, 2013, with the same complaints. [R. 555].

On September 10, 2013, Patrick J. Carolan, M.D. ("Dr. Carolan"), an orthopedist, performed a physical examination and determined her range of motion in the cervical spine was about 50% of what would be normally expected. [R. 549]. Dr. Carolan's impressions were that Plaintiff had cervical disk disease with disk herniation, ankylosing spondylitis of the thoracic spine, and probable degenerative disk disease of the lumbar spine. [R. 549]. He recommended physical therapy and prescribed motrin. [R. 550]. Plaintiff attended nine 30-45 min physical therapy

sessions between September 20, 2013 and October 31, 2013. [R. 665-69]. On October 29, 2013, Plaintiff told Dr. Carolan that she had not noticed any benefit from physical therapy. [R. 545]. Dr. Carolan observed the following: "Examination of cervical spine revealed marked loss of motion throughout the cervical spine with complaints of pain going into her upper extremity. Her neurological examination revealed some weakness of volar flexion of her left wrist. Her deep tendon reflexes were hypoactive in both upper extremities." [R. 545]. Dr. Carolan ordered an MRI and her remaining therapy sessions were cancelled "per MD order." [R. 545, 671].

Plaintiff obtained an MRI on November 14, 2013, which indicated "[e]xuberant osteophyte formation throughout the cervical spine, mild cord compression at C4/5 and left foraminal narrowing at C5/6." [R. 543-44]. The notations indicated the vertebrae appearance and any abnormalities are "unchanged" from the prior MRI taken May 21, 2012. [R. 543]. Plaintiff thereafter made additional visits to Family Health Center and the St. Vincent's Emergency Room with complaints about pain in her spine and legs. [R. 854 (April 11, 2014), 922 (Feb. 3, 2014)].

Plaintiff was referred by her primary physician to an ENT for a consultation on a "thyroid mass." [R. 673]. On March 21, 2014, Sara Richer, M.D., F.A.C.S. ("Dr. Richer"), discussed with the Plaintiff "the need for a total thyroidectomy to eliminate compression of her airway" and the "need to obtain a TSH level for further evaluation of enlarged thyroid." [R. 674]. Plaintiff was "started on a PPI for reflux symptoms and was given an antireflux diet." [R. 674].

Plaintiff visited Fairfield Medicine, St. Vincent's MultiSpecialty Group, on April 25, 2014, for nighttime leg pain, headaches and dizziness. [R. 690]. In relevant part, Anna Pankratov, M.D. ("Dr. Pankratov"), prescribed Gabapentin for her leg pain, and she recommended regular exercise and caloric restrictions to address her obesity. [R. 693]. Three days later, Plaintiff received treatment from Dr. Sara Richer ("Dr. Richer") and appeared "hesitant to undergo surgery." [R. 677]. Plaintiff returned to Dr. Prankatov for headaches and leg pain on August 26, 2014. [R. 686]. Dr. Pankratov ordered x-rays, which revealed calcaneal spurs and ankle swelling. [R. 689, 966]. During a follow up visit on December 22, 2014, Plaintiff complained of pain in her neck, left arm, and lower back. [R. 678]. She also stated her grip was weak, requiring her to wear wrist braces daily and that she was still experiencing headaches. [R. 678]. On January 30, 2015, Dr. Pankratov noted Plaintiff was "unable to walk four blocks without symptoms and unable to walk two flights of stairs without symptoms" and that "she has poor tolerance to exertion due to her weight." [R. 926].

## II. Procedural History

Plaintiff filed an application for DI and SSI benefits on June 7, 2013. [R. 114]. On July 30, 2013, the Social Security Administration ("SSA") determined that the Plaintiff was not entitled to benefits and denied her claims. [R. 114]. Plaintiff requested reconsideration on October 3, 2013, but was denied on December 30, 2013. [R. 114]. Thereafter, Plaintiff filed a request for a hearing. [R. 114].

Plaintiff's matter was assigned to ALJ Thomas who held a hearing on January 23, 2015. [R. 114, 203-24]. On April 20, 2015, ALJ Thomas issued an unfavorable decision for the Plaintiff. [R. 111]. Plaintiff filed a request for review by the Appeals Council on June 8, 2015. [R. 110]. On September 23, 2016, the Appeals Council denied the Plaintiff's Request for Review making ALJ Thomas' decision final. [R. 4-8]. Plaintiff commenced the instant action in this District on December 2, 2016. [Dkt. 1 (Compl.)].

## III. <u>ALJ Decision</u>

ALJ Thomas issued several findings in his decision on April 20, 2015, which are subject to review by this Court. ALJ Thomas determined Plaintiff did not engage in substantial gainful activity since May 1, 2005, the alleged onset date. [R. 117]. He found she suffers from the following severe impairments: degenerative disk disease, carpal tunnel syndrome, obesity and asthma as defined under 20 C.F.R § 404.1520(c) and § 416.920(c). [R. 117]. ALJ Thomas also determined Plaintiff's thyroid impairments and headaches to be non-severe. [R. 117]. He then concluded Plaintiff's severe and non-severe impairments did not individually or collectively meet or medically equal one of listed impairments under 20 C.F.R. Part 404, Subpart P, Appendix 1. [R. 117].

ALJ Thomas ruled Plaintiff has an RFC to perform "light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant requires a work environment free from poor ventilation, dusts, fumes, gases, odors, humidity, wetness and temperature extremes and requires an environment consisting of only

occasional bending, twisting, squatting, balancing, crawling, climbing and kneeling." [R. 119]. In a footnote, ALJ Thomas clarified he "fully considered the claimant's body weight in determining the residual functional capacity for light exertional activity." [R. 118].

ALJ Thomas's decision was based on non-examining physicians' functional assessment that the plaintiff was "capable of lifting and/or carrying 20 pounds occasionally and 10 pounds frequently, standing and/or walking about 6 hours in an 8-hour workday and sitting about 6 hours in a 8-hour work day." [R. 122-23]. ALJ Thomas also summarized that Plaintiff "failed to exhibit significant findings on clinical examinations," that there were "no records to substantiate the claimant's allegations of symptoms severity," and there did not exist "any opinions from a treating or examining physician indicating that the claimant is disabled or even has limitations greater than those determined. . . ." [R. 123]. He also concluded that Plaintiff's allegations were "not entirely credible because they are not supported by the evidence of record to the extent they suggest a more restrictive residual functional capacity." [R. 123].

After making the RFC determination, ALJ Thomas found Plaintiff was unable to perform any past relevant work as a machine operator or home health aide. [R. 123]. In considering the Plaintiff's "age, education, work experience, and residual functional capacity," ALJ Thomas determined there existed a significant number of jobs in the national economy that Plaintiff can perform. [R. 124]. At the hearing, ALJ Thomas asked the vocational expert a hypothetical of the doable jobs for a person with Plaintiff's "age, education, and past relevant work experience" who is

limited to "light work" and has additional restrictions (1) "of the need for an environment free from poor ventilation, dust, fumes, gases, odors, humidity, wetness, and temperature extremes"; and (2) "requires an environment of only occasional bending, twisting, squatting, balancing, crawling, climbing and kneeling"; and (3) "has a body weight of 244 pounds." [R. 219]. The vocational expert surmised jobs available to the hypothetical person, which the person could perform, include assembler of small products, electronics worker, and janitor with limitations for lifting (i.e. "no mopping or sweeping of floors, no repairing holes[,] no changing lightbulbs"). [R. 124, 220-21]. ALJ then determined Plaintiff was "not disabled" in light of her RFC and the availability of other jobs for her to perform. [R. 125].

### Legal Standard

"A district court reviewing a final . . . decision [of the Commissioner] pursuant to section 205(g) of the Social Security Act, 42 U.S.§ 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842 (2d Cir. 1981). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, [are] conclusive . . . ." 42 U.S.C. § 405(g). Accordingly, the court may not make a *de novo* determination of whether a plaintiff is disabled in reviewing a denial of disability benefits. *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the court's function is to assess the administrative record, ascertain whether the Commissioner applied the correct legal principles in reaching his/her conclusion, and conclude whether the decision is supported by substantial evidence. *Id.*; *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

Therefore, absent legal error, this court may not set aside the decision of the Commissioner if it is supported by substantial evidence. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). Further, if the Commissioner's decision is supported by substantial evidence, that decision will be sustained, even where there may also be substantial evidence to support the plaintiff's contrary position. *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982).

The Second Circuit has defined substantial evidence "as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Substantial evidence must be "more than a scintilla or touch of proof here and there in the record." *Williams*, 859 F.2d at 258.

## Discussion

The SSA establishes that benefits are payable to individuals who have a disability. 42 U.S.C. § 423(a)(1). "The term 'disability' means . . . [an] inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . ." 42 U.S.C. § 423(d)(1). A person is disabled under the SSA when their impairment is "of such severity that he is not only unable to do his previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). "[W]ork which exists in the national economy means work which

exists in significant numbers either in the region where such individual lives or in several regions of the country." *Id.*

In order to evaluate disability claims, the SSA has promulgated the following five-step procedure:

> 1. First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity ("Step One").
>
> 2. If she is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits her physical or mental ability to do basic work activities ("Step Two").
>
> 3. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations ("Step Three").
>
> 4. If the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the Residual Functional Capacity ("RFC") to perform her past work ("Step Four").
> 5. Finally, if the claimant is unable to perform her past work, the [Commissioner] then determines whether there is other work which the claimant could perform ("Step Five").

*Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (citing 20 C.F.R. § 404.1520).

Plaintiff challenges ALJ Thomas's decision at Step Four and Step Five.

I.   Step Four

A claimant's RFC is "what an individual can still do despite his or her limitations." SSR 96–8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96–8p"), 1996 WL 374184, at *2 (S.S.A. July 2, 1996); *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p).   "Ordinarily, RFC is the individual's maximum remaining ability to do

sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis."[2] SSR 96–8p, 1996 WL 374184, at *2. "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.*; *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (defining RFC as "an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continued basis") (quoting SSR 96–8p, 1996 WL 374184, at *1). RFC is "an assessment based upon all of the relevant evidence . . . [which evaluates a claimant's] ability to meet certain demands of jobs, such as physical demands, mental demands, sensory requirements, and other functions." 20 C.F.R. § 220.120(a).[3]

As previously stated, ALJ Thomas determined Plaintiff has an RFC to perform "light work" with two limitations: (1) she "requires a work environment free from poor ventilation, dusts, fumes, gases, odors, humidity, wetness and temperature extremes"; and (2) she "requires an environment consisting of only occasional bending, twisting, squatting, balancing, crawling, climbing and kneeling." [R. 119]. Plaintiff challenges this conclusion on three main bases. First, she contends ALJ Thomas did not properly develop the record. [Dkt. 21-2 at 1-9].

---

[2] The determination of whether such work exists in the national economy is made without regard to: (1) "whether such work exists in the immediate area in which [the claimant] lives;" (2) "whether a specific job vacancy exists for [the claimant];" or (3) "whether [the claimant] would be hired if he applied for work." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987) (internal quotation marks omitted).

[3] An ALJ must consider both a claimant's severe impairments and non-severe impairments in determining his/her RFC. 20 C.F.R. § 416.945(a)(2); *De Leon v. Sec'y of Health & Human Servs.*, 734 F.2d 930, 937 (2d Cir. 1984).

Second, she posits ALJ Thomas did not adequately consider her "severe impairment" of obesity. *Id.* at 10-12. Third, she argues ALJ Thomas did not properly consider her complaints about pain. *Id.* at 12-19.

A. *The ALJ's Development of the Record*

It is Plaintiff's position that the absence of any treating physicians' medical opinions regarding her limitations constitutes a gap in the record that ALJ Thomas had a duty to fill in. *Id.* at 2-9. The Commissioner responds that ALJ Thomas sufficiently developed the record for four reasons. First, Plaintiff's counsel indicated that the record was complete there were no outstanding reports at the hearing. [Dkt. 22-1 at 7; R. 222-24]. Second, non-treating medical consultants gave their medical opinion on her limitations and RFC. [Dkt. 22-1 at 8-9]. Third, an ALJ is entitled to assess the RFC when the record contains sufficient evidence, including treatment notes, despite the absence of a formal medical opinion. *Id.* at 10. Finally, it is the Plaintiff's burden to provide evidence of the existence of a disability. *Id.*

The ALJ has an affirmative obligation to fully develop the administrative record, even when the claimant is represented by counsel. See *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508–09 (2d Cir.2009); *Casino–Ortiz v. Astrue*, 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007) (citing *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir.1996)). A treating physician's opinion is particularly important to a disability determination. *See Hallet v. Astrue,* No. 3:11-cv-1181, 2012 WL 4371241, at *6 (D. Conn. Sept. 24, 2012) (concluding that "[b]ecause the expert opinions of a treating physician as to the existence of a disability are binding on the factfinder, it is not

sufficient for the ALJ simply to secure raw data from the treating physician" and remanding for further development of the record). However, this obligation must be balanced with the other overarching principle established by 20 C.F.R. § 404.1512: it is the ongoing responsibility of the claimant to submit all evidence known to the claimant relating to his or her disability, and an ALJ need only go so far as to develop the "complete medical history." 20 C.F.R. § 404.1512(a)(1), (b)(1)(ii).

The parties heavily brief the application of *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29 (2d Cir. 2013), which is a Second Circuit summary order clarifying how to balance the ALJ's affirmative duty to develop the record despite the associated limitations. At the time of the summary order, the regulations contained a provision that no longer exists: that the Commissioner "will request a medical source statement about what you can still do despite your impairment(s)," but that "the lack of the medical source statement will not make the report incomplete." 20 C.F.R. § 416.913(b)(6) (2015). The regulation also stated that "[m]edical reports should include . . . [a] statement about what [a claimaint] can still do despite [her] impairment(s)." *Id.*; *see Luciano v. Comm'r of Soc. Sec.*, No. 16 CIV. 5963 (GWG), slip op. at 6 (S.D.N.Y. Sept. 28, 2017) (citing 20 C.F.R. § 416.913(b)(6) (2015)). Because these provisions were in effect at the time ALJ Thomas made his determination, the Court will apply the reasoning of *Tankisi* and its progeny.[4] *See*

---

[4] The Court recognizes *Tankisi* is a summary order that does not have precedential effect. There does not exist any binding decisions from the Second Circuit on this issue, but numerous lower courts and the Second Circuit summary orders have applied the reasoning in *Tankisi*. *See, e.g., Guillen v. Berryhill*, 697 F. App'x 107, 108 (2d Cir. 2017); *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017);

*Luciano*, slip op. at 6 (applying *Tankisi* as § 416.913(b)(6) (2015) was "[t]he relevant regulation in effect at the time that the ALJ rendered his decision").

The parties agree that *Tankisi* applies to this case, but they dispute whether the case necessitates remand.  In *Tankisi*, the ALJ failed to seek a medical opinion from the claimant's treating physicians regarding her ability to "meet the physical demands of work."  *Tankisi*, 521 F. App'x at 33.  The Second Circuit ruled that the applicable regulations indicated "remand is not always required when an ALJ fails in his duty to request opinions, particularly where, as here, the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity."  *Id.* at 34.  The plaintiff's attorney submitted medical evidence on her behalf, *id.* at 33 n.1, and the Second Circuit noted the medical record was "quite extensive," *id.* at 34.  The record did not contain any formal opinions from treating physicians about the plaintiff's RFC, but one treating physician did include an assessment of her limitations.  *Id.*  The Second Circuit held, "Given the specific facts of the case, including a voluminous medical record assembled by the claimant's counsel that was adequate to permit an informed finding by the ALJ, we hold that it would be inappropriate to remand solely on the ground that the ALJ failed to request medical opinions in assessing residual functional capacity."  *Id.*

In essence, *Tankisi* dictates that remand for failure to develop the record is situational and depends on the "circumstances of the particular case, the

---

*DeLeon v. Colvin*, No. 15-CV-01106 (JCH), 2016 WL 3211419, at *4 (D. Conn. June 6, 2016); *Jacovino v. Berryhill*, No. 16 Civ. 3187 (LTS) (HBP), slip op. at 19-21 (S.D.N.Y. Dec. 22, 2017); *Wolf v. Berryhill*, No. 1:16-cv-00327-MAT, slip op. at 2-3 (W.D.N.Y. Nov. 8, 2017); *Luciano*, slip op. at 6-7.

comprehensiveness of the administrative record, and . . . whether an ALJ could reach an informed decision based on the record." *Sanchez v. Colvin*, 2015 WL 736102, at *5-6 (S.D.N.Y. Feb. 20, 2015) (citing *Tankisi*, 521 F. App'x at 33-34); *Jacovino*, slip op. at 20. This case appears similar to *Tankisi* on the surface; after all, there are nearly 1,000 pages of medical evidence, which can clearly be considered "quite extensive" on a superficial level. But the real import lies in *what* those 1,000 pages say, not the mere fact the records exist. And this difference changes the outcome. Not one treating physician opined about Plaintiff's functional limitations with respect to her ability to work, which sharply contrasts from the situation in *Tankisi* where the ALJ was able to rely on the treating physician's assessment of the plaintiff's limitations. *See id.* at 34.

Indeed, courts within this circuit have remanded when the ALJ failed to request a medical source statement from a treating physician and the medical record contained no assessments of the claimant's functional limitations. *See Paredes v Commissioner of Social Security,* No. 16-CV-00810 (BCM), slip op. at 18 (S.D.N.Y. May 19, 2017) (remanding where the only medical opinion on claimant's physical limitations came from a non-examining medical expert "who based his opinion . . . entirely on his review of non-opinion medical records from the claimant's treating physicians and the claimant's testimony at the second of his two hearings"); *Guillen*, 697 Fed. App'x at 108 ("Unlike *Tankisi*, the medical records obtained by the ALJ do not shed any light on Guillen's residual functional capacity, and the consulting doctors did not personally evaluate Guillen."); *DeLeon*, 2016 WL 3211419, at *4 (differentiating cases where treatment notes expressed a treating

physician's views on the claimant's RFC from the claimant's case in which there was "<u>no</u> indication of the views of DeLeon's treating physicians as to her [RFC] in light of her physical and <u>mental impairments</u>") (emphasis in original); *Luciano*, slip op. at 7 (remanding because, "by contrast [to *Tankisi*], there are assessments only from consultative examiners, not from any treating sources," "the treatment notes in the medical record do not clearly address any limitations Luciano may have," and "Luciano was acting <u>pro se</u> during the hearing"); *Guarino v. Colvin*, 1:14-CV-00598 (MAT), 2016 WL 690818, at *2 (W.D.N.Y. Feb. 22, 2016) (finding remand appropriate where the medical record contained no treating physician opinion and only a non-examining state agency psychiatrist's evaluation of plaintiff's limitations at the time the ALJ issued his decision).

Here, the medical records merely indicate her diagnoses and symptoms but they "offer no insight into how her impairments affect or do not affect her ability to work, or her ability to undertake her activities of everyday life." *Guillen*, 697 F. App'x at 109. Defendant does not dispute this fact. *See* [Dkt. 22-2 at 7-10]. An ALJ cannot determine the RFC solely "on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence." *Guarino*, 2016 WL 690818, at *2 (emphasis omitted). This case is not one in which the treating physician's notes elucidate the plaintiff's functional limitations.[5] *See, e.g., Tankisi*, 521 F. App'x at 34 (affirming

---

[5] To the extent Dr. Pankratov documented Ms. Holt's inability to walk four blocks or two flights of stairs without symptoms and commented she has "poor tolerance to exertion due to her weight," the Court notes this observation was made in the context of a pre-operative evaluation for a thyroidectomy, and her thyroid issues were determined to be a non-severe impairment while obesity was determined to

even though there did not exist formal opinions on the plaintiff's RFC from a treating physician, because one treating physician provided an assessment of the plaintiff's limitations); *Matta v. Astrue*, 508 F. App'x 53, (2d Cir. 2013) (affirming where the ALJ relied on four medical source statements from one consultative examiner and three treating physicians regarding the plaintiff's symptoms and limitations); *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (affirming where the treating physician's notes documented the plaintiff's mental and physical characteristics and social activities speaking directly to her functional capacity); *Axon v. Berryhill*, 3:17cv604 (WWE), slip op. at 2 (D. Conn. Feb. 28, 2018) (affirming an ALJ's decision when it was based on treatment records and evaluations "indicating that plaintiff had only 'mild' deficiency across measures of attention, working memory, and executive functioning" and a consultative examiner and state agency consultant determined the plaintiff could perform simple, routine tasks).  The Court finds ALJ Thomas's failure to procure medical source opinions from treating physicians about Plaintiff's functional limitations warrants remand in light of *Tankisi* and subsequent cases interpreting it.

On remand, the ALJ is directed to seek out medical opinions from treating physicians regarding Plaintiff's mental and physical functional limitations and to seek out a consultative examiner's opinion if necessary.  *See Guarino*, 2016 WL 690818, at *3.

---

be a severe impairment.  [R. 926].  Defendant does not argue that this one observation regarding these impairments renders the record fully developed, and as such the Court will not address this issue.  Indeed, ALJ Thomas determined Ms. Holt to have other severe and non-severe impairments not contemplated by this one treating physician's note.

**B.** *The ALJ's Consideration of Obesity*

Plaintiff argues that the Commissioner did not adequately address the severe impairment of obesity and did not consider the combination of the Plaintiff's impairments. [Dkt. 21-2 at 10]. The Commissioner argues the impairment of obesity was addressed in Step Two through Step Five and that each impairment was addressed singularly and in combination. [Dkt. 22-1 at 11-12].

When assessing an individual's RFC, an ALJ must consider the "combined impact of the impairments." *Burgin v. Astrue*, 348 F. App'x 646, 647 (2d Cir. 2009) (acknowledging "the combined impact of impairments" must be considered at all steps once an ALJ determines there exists a "severe impairment"). Obesity is no exception—"the ALJ must evaluate obesity in conjunction with claimant's [RFC] by assessing the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment." *See Crossman v. Astrue*, 783 F. Supp. 2d 300, 309-10 (D. Conn. 2010); SSR 02-1P, Policy Interpretation Ruling Titles II and XVI: Evaluation of Obesity ("SSR 02-1P"), 2002 WL 34686281, at *1 (S.S.A. Sept. 12, 2002) (acknowledging the provisions "instruct adjudicators to consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity"). This is in part because obesity can have the effect of "increase[ing] the severity of coexisting impairments, particularly those affecting the musculoskeletal, cardiovascular and respiratory systems." *Id.* at 309.

In this case, ALJ Thomas acknowledged "the record is void of any assessment demonstrating what functional limitations may exist," but nonetheless considered obesity and its effect on the RFC "in combination with her other severe impairments." [R. 118]. ALJ Thomas specifically noted in a footnote he "fully considered the claimant's body weight in determining the [RFC] for light exertional activity." [R. 118 n.1]. In addition, he expressly considered obesity at Step Three and accounted for Plaintiff's weight during Step Five when posing the second hypothetical to the vocational expert. [R. 117-18, 219]. It is certainly best practices to explicitly consider the impact of obesity on Plaintiff's functional limitations in light of the other identified impairments, but courts have upheld an ALJ's general reference to obesity's impact at Step Four. *See generally Lucas v. Colvin*, No. 3:14CV-00775 (AVC), slip op. at 8 (D. Conn. Mar. 31, 2016) (affirming RFC determination where the ALJ "specifically discussed her obesity and its effect on her ability to do basic work activities"); *Wages v. Comm'r of Soc. Sec.*, 3:11–CV–1571 (JCH), 2013 WL 3243116, at *5 (D. Conn. June 26, 2013) (affirming ALJ's decision where he "consider[ed] the impact from obesity and the chronic pain syndrome as well as the overall impact of obesity on all Wages' symptoms and impairments") (internal quotation marks omitted); *Whitley v. Colvin*, No. 3:17CV00121 (SALM), slip op. at 10 (D. Conn. Feb. 23, 2018) ("Additionally, the ALJ specifically considered plaintiff's obesity, noting that in September of 2009, 'she was 5'5" and weighed 184 pounds.'"); *Lillis v. Colvin*, No. 3:16-cv-269(WIG), slip op. at 2 (D. Conn. Mar. 1, 2017) ("Since Plaintiff cannot identify any specific functional limitation related to obesity, and because the ALJ specifically addressed obesity

grouped with the other conditions, the ALJ properly considered the combined effect of Plaintiff's impairments.").  The Court need not decide this issue as this case is remanded on other grounds, but on remand the ALJ should take care to effectuate the purposes of the regulations in a manner consistent with the courts' interpretations.

### C. *The ALJ's Consideration of Plaintiff's Credibility*

The Plaintiff next argues that the ALJ's decision with respect to her credibility is not supported by substantial evidence because the ALJ did not take the Plaintiff's claims of pain into account "in a meaningful manner."  [Dkt. 21-2 at 14]. The Commissioner responds that the ALJ's decision with respect to the Plaintiff's credibility was proper and is supported by substantial evidence.  Specifically, the Commissioner posits Plaintiff only required conservative treatment, responded well to physical therapy and clinical findings of normal gait and strength in her lower extremities. [Dkt. 22-1 at 13-14].

"When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account . . . ." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  However, the ALJ "is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record."  *Id.*   The ALJ's "finding that the witness is not credible must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record."   *Williams*, 859 F.2d at 260-61.   The "ALJ's

credibility determination is generally entitled to deference on appeal." *Selian v. Astrue*, 708 F.3d 409, 420 (2d Cir. 2013).

In determining credibility, the ALJ must first determine if the claimant's asserted symptoms could "reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §§ 404.1529(a), 416.929(a). If the objective evidence does not support the plaintiff's testimony with respect to functional limitations and pain, the ALJ considers the factors set forth in 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *Skillman v. Astrue*, No. 08-CV-6481, 2010 WL 2541279, at *6 (W.D.N.Y. June 18, 2010). The enumerated factors to be considered are (i) the claimant's daily activities; (ii) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate their pain or other symptoms; (v) treatment, other than medication, the claimant receives or has received for relief of their pain or other symptoms; (vi) any measures the claimant used or has used to relieve their pain or other symptoms (e.g., lying flat on their back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

Given this case must be reevaluated after obtaining additional evidence, the Court will not evaluate ALJ Thomas's determination of Plaintiff's credibility with respect to pain. However, as before, the Court directs the ALJ to take into

consideration and properly implement the binding regulations and legal principles that govern this analysis.

## II.  <u>Step Five</u>

Step Five requires the Commissioner to determine whether "significant numbers of jobs exist in the national economy that the claimant can perform." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (citing 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(40(v)).  Although the plaintiff carries the burden of proof at Step One through Step Four, the burden shifts at Step Five and requires the Commissioner to show other work can be performed.  *See Brault v. Soc. Sec. Amin., Comm'r*, 683 F.3d 443, 445-46 (2d Cir. 2012).  There are two methods by which an ALJ can make this determination: "either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert*." Id.*  "An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as 'there is substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion,'" *McIntyre,* 758 F.3d at 151 (quoting *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983)), and the hypothetical "accurately reflect[s] the limitations and capabilities of the claimant involved."  *Id.* The vocational expert, however, need not "identify with specificity the figures or sources supporting his conclusion, at least where he identified the sources generally."  *Id.* at 152.

Plaintiff argues that the ALJ erred at Step Five because he did not properly establish the vocational expert held the requisite qualifications and the expert did not explain his methodologies, and he posed a hypothetical to the vocational

expert that did not account for the limitations of the Plaintiff's degenerative disk disease and carpal tunnel syndrome. [Dkt 21-2 at 19-23]. The Commissioner responds that the ALJ's decision was proper and the vocational expert's opinion was supported by methodology and evidence. [Dkt. 22-1 at 17-19]. In addition, the national economy jobs provided by the vocational expert accounted for Plaintiff's limitations, the vocational examiner was qualified, Plaintiff's counsel had the opportunity to object to the examiner at the time of the hearing, and a step-by-step description of the methodology is not necessary and could have been challenged by counsel at the time of the hearing. *Id.*

These issues are now moot because the ALJ is instructed to develop the medical record and accordingly must re-evaluate Step Five on remand. In light of the fact the ALJ must revisit Step Five, the Court notes that ALJ Thomas merely referenced the vocational expert's résumé as the basis for his qualifications, [R. 217], but Plaintiff's counsel did not cross-examine the vocational expert on his qualifications or methodologies, [R. 221-22]. While the Federal Rules of Evidence do not apply at this administrative proceeding, it nonetheless must be established that a vocational expert's opinion is reliable. *See Jones-Reid v. Astrue*, 934 F. Supp. 2d 381, 406-07 (D. Conn. 2012). Cross-examination of the vocational expert provides the plaintiff with the opportunity to challenge a vocational expert's qualifications as well as the statistics or methodologies upon which the vocational expert relies, and it behooves counsel to make these challenges in order to preserve them on appeal. *See Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 451 (2d Cir. 2012); *Haskins v. Comm'r of Soc. Sec.*, No. 5:05-CV-292 (DNH/RFT),

2008 WL 5113781, at *16 (N.D.N.Y. Nov. 25, 2008).  With respect to ALJ Thomas's hypotheticals posed to the vocational examiner, the Court reminds the ALJ that his hypotheticals must "accurately reflect the limitations and capabilities of the claimant involved." *McIntyre*, 758 F.3d at 152.

## Conclusion

For the aforementioned reasons, the Court REVERSES the administrative decision and REMANDS the case for further proceedings.  The Clerk is directed to close this case.

IT IS SO ORDERED

_____/s/_____

Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: March 13, 2018